United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA SULTANIS,<br><br>Plaintiff,<br><br>v.<br><br>CHAMPION PETFOODS USA INC., et al.,<br><br>Defendants. | Case No.  21-cv-00162-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS TO DISMISS**<br><br>Docket No. 24 |
| PATRICIA SULTANIS,<br><br>Plaintiff,<br><br>v.<br><br>CHAMPION PETFOODS USA, INC., et al.,<br><br>Defendants. | Case No.  21-cv-00167-EMC<br><br><br><br>Docket No. 21 |

Pending before the Court is Defendants Champion Petfoods USA Inc. and Champion Petfoods LP's (collectively, "Champion's") motions to dismiss Plaintiff Patricia Sultanis's class action complaints in *Sultanis v. Champion Petfoods USA, Inc. et al*, No. 3:21-cv-00162-EMC (N.D. Cal. filed Jan. 8, 2021) (the "Poultry Action") and *Sultanis v. Champion Petfoods USA, Inc. et al*, No. 3:21-cv-00167-EMC (N.D. Cal. filed Jan. 8, 2021) (the "Fish Action") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  *See* Poultry Action, Docket No. 24 ("Poultry Mot"); Fish Action, Docket No. 21 ("Fish Mot").  Champion also moves to strike the nationwide and multi-state class allegations from both complaints.  *See id.*

For the following reasons, the Court **DENIES in part** and **GRANTS in part** both motions.

United States District Court
Northern District of California

# I.     BACKGROUND

A.     Factual Allegations

Ms. Sultanis's class action complaints allege as follows.  Ms. Sultanis is a resident of Walnut Creek, California.  *See* Poultry Action, Docket No. 1 ("Poultry Compl.") ¶¶ 5–7; Fish Action, Docket No. 1 ("Fish Compl.") at ¶¶ 5.  She purchased Champion's Acana brand petfood marketed and labeled as being made with "free-run" poultry and "wild-caught" fish (the "Products") for the four years preceding the filing of her complaint, and most recently on July 24, 2017.  Poultry Compl. ¶¶ 1, 5; Fish Compl. ¶¶ 1, 5.  Ms. Sultanis alleges that the poultry Products were marketed with statements that included "made with fresh free-run chicken, turkey, & cage free eggs":

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

United States District Court
Northern District of California

 

Poultry Compl. ¶ 14.  The poultry Products also used chicken icons with the descriptor "free-run chicken," and depicted chickens outdoors on grass:

///

///

///

///

///

///

///

///

///

///



*Id.* ¶¶ 15–16.  Similarly, the Champion website states that "[r]aised under the highest standards for animal care and food safety by people we know and trust, on family-run American farms, our free-run poultry and cage-free eggs are nourishing, natural, and antibiotic free":

## FREE-RUN POULTRY AND CAGE-FREE EGGS

DELIVERED FRESH OR RAW

Raised under the highest standards for animal care and food safety by people we know and trust, on family-run American farms, our free-run poultry and cage-free eggs are nourishing, natural, and antibiotic free.

*Id.* ¶ 18.  The website also describes Champion's chicken supplier as "Todd of Clark Farms in Lexington, Kentucky," even though the person depicted alongside that statement is in fact Greg Hefton of Tyson Foods:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Our chicken is raised free-run by people we know and trust, like Todd of Clark Farms in Lexington, Kentucky. Free of artificial hormones and antibiotics, our chickens are sourced from federally inspected facilities, contain no preservatives, and are bursting with goodness and taste.

*Id.* ⁋ 19.

Based on these statements, Ms. Sultanis alleges she—and other "reasonable consumers"—expected the poultry Products were made with chickens "raised in better, more humane conditions than typical chickens grown for meat," and that "have access to the outdoors." *Id.* ⁋ 21–22; *see also id.* ⁋ 29 ("Champion's Free-Run Poultry Claims are intended to lead consumers into believing that 'free-run' poultry comes from birds who had free access to the outdoors and that were raised under conditions that significantly exceeded industrywide animal welfare standards."). She also alleges that "[to] reasonable consumers . . . 'free-run' is synonymous with 'free range.'" *Id.* ⁋ 26. As an example, Ms. Sultanis attaches an Amazon review by a consumer stating that "[f]ree range chicken is the meat in [the Products]." *Id.* ⁋ 29. According to Ms. Sultanis, however, the poultry Products are made from "factory-farmed birds raised under standard industrial conditions—confined in crowded barns without outdoor access." *Id.* ⁋ 2. Therefore, Ms. Sultanis contends that she and the putative class members she seeks to represent were "harmed by purchasing the [poultry] Products under false pretenses and paying more for [them] than they otherwise would have, if they would have purchased [them] at all." *Id.* ⁋ 3.

Ms. Sultanis also alleges that the fish Products are marketed with statements on the package that included "ACANA Grasslands is brimming with . . . wild-caught rainbow trout" or "brimming with . . . wild-caught fish":

///

///

///

5

United States District Court
Northern District of California







///

///

///

///

///

///

///

///

///

///

///

///

6

United States District Court
Northern District of California

1   Fish Compl. ¶ 14, 19.  The packaging also depicts a fisherman next to what looks like a fresh body

2   of water with the caption "trusted supplier of fresh wild-caught fish:"



17   *Id.* ¶ 20.

18         Similarly, the Champion website states that "ACANA Freshwater Fish is packed with

19   whole, wild-caught rainbow trout" and that "[Champion's] saltwater fish are sustainable and wild-

20   caught from New England's cold and fertile waters, and [their] freshwater fish from American

21   waters—all whisked to [their] DogStar Kitchen fresh or raw."  *Id.* ¶¶ 15–16.  The Champion

22   website also described its freshwater fish (which includes rainbow trout) as "Fresh, Whole, and

23   Wild Freshwater Fish" and specifically represented that it is "[s]ustainably caught by fishermen

24   we know and trust," along the photograph of a fisherman standing in what looks like a fresh-water

25   ///

26   ///

27   ///

28   ///

7

lake holding a wild-caught catfish:



*Id.* ¶ 17.  Champion also allegedly describes its products on the Petco and Amazon websites as

having "wild-caught rainbow trout:"

///

///

///

///

///

///

///

///

///

///

///

///



*Id.* ¶ 18.

Based on these statements, Ms. Sultanis alleges she purchased the products believing they were made with wild-caught fish. *Id.* ¶ 41. According to Ms. Sultanis, however, the fish Products are actually made with "rainbow trout from industrial fish farms" in Idaho and "do not use wild-caught fish." *Id* ¶¶ 2, 22–24. In fact, she points out that Champion was sued by Animal Equality,

1  which commissioned laboratory tests that revealed the fish Products tested positive for

2  ethoxyquin, a chemical that is only found in farmed fish, not wild-caught fish.  *Id.* ¶¶ 25–27.

3  Therefore, Ms. Sultanis contends that she and the putative class members she seeks to represent

4  were "harmed by purchasing the [fish] Products under false pretenses and paying more for [them]

5  than they otherwise would have, if they would have purchased [them] at all."  *Id.* ¶ 3.

6       Ms. Sultanis brings these actions on behalf of herself and all other similarly situated

7  individuals nationwide (the "Nationwide Class"), in thirteen (13) states (the "Multi-State Class"),[1]

8  and in California (the "California Sub-Class").  Poultry Compl. ¶ 64; Fish Compl. ¶ 56.  She

9  brings claims for violations of the individual states' consumer fraud acts on behalf of the Multi-

10  State Class (Count 1); breach of express warranty on behalf of the California Sub-Class, Poultry

11  Compl. ¶¶ 83–89 (Count 2); violations of the California Consumers Legal Remedies Act (CLRA),

12  Cal. Civ. Code § 1761, on behalf of the California Sub-Class (Count 3); violations of the

13  California False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500, on behalf of the

14  California Sub-Class (Count 4); and California Unfair Competition Law (UCL), Cal. Bus. & Prof.

15  Code § 17200, on behalf of the California Sub-Class (Count 5).  *See* Poultry Compl. ¶¶ 76–125;

16  Fish Compl. ¶¶ 68–117.  Ms. Sultanis also brings an unjust enrichment claim on behalf of the

17  Nationwide Class and the California Sub-Class in the Poultry Action (Count 6).  *See* Poultry

18  Compl. ¶¶ 126–31.

19  B.    Procedural History

20       Ms. Sultanis filed both complaints on January 8, 2021.  *See* Poultry Compl.; Fish Compl.

21  On March 19, 2021, Champion filed the pending motions to dismiss the complaints.  *See* Poultry

22  Mot.; Fish Mot.

23  ///

24  ///

25  ///

26

27  [1] The states included in the Multi-State Class are California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Washington, and Wisconsin.  Poultry Compl. ¶ 64; Fish Compl. ¶ 56.

28

## II.     LEGAL STANDARDS

A.     Rule 12(b)(1) Motion to Dismiss for Lack of Standing[2]

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction.  When subject matter jurisdiction is challenged, "[t]he party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists."  *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986).  A Rule 12(b)(1) motion will be granted if the complaint, considered in its entirety, fails on its face to allege facts sufficient to establish subject matter jurisdiction.  *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 (9th Cir. 2003). "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under [Rule] 12(b)(1)."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  "For purposes of ruling on a motion to dismiss for want of standing . . .  the [trial court] . . .  must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."  *Id.* at 1068 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Importantly, in determining constitutional standing, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."  *Id.* at 1067 (quoting *Warth*, 422 U.S. 490 at 501); *see also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.,* 256 F.3d 879, 882 (9th Cir. 2001) (in assessing standing, the court may consider "the complaint and any other particularized allegations of fact in affidavits or in amendments to the complaint").

The "irreducible constitutional minimum" of standing requires a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 489 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins* ("*Spokeo II*"), 136

---

[2] Champion also argues that this Court lacks personal jurisdiction, under Rule 12(b)(2), over the claims of non-California unnamed plaintiffs because there is no independent relationship between those claims and Champion's actions in this district.  *See Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., S.F.*, 137 S. Ct. 1773, 1780 (2017).  As explained below, the Court need not address this argument because it dismisses the claims of non-California unnamed plaintiffs for lack of standing.  *See infra* Part III.A.

1    S. Ct. 1540, 1547 (2016)).  These three elements are referred to as, respectively, injury-in-fact,

2    causation, and redressability.  *See Planned Parenthood of Greater Was. & N. Idaho v. U.S. Dep't*

3    *of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).  "The plaintiff, as the party

4    invoking federal jurisdiction, bears the burden of establishing these elements," which at the

5    pleadings stage means "'clearly . . . alleg[ing] facts demonstrating' each element."  *Spokeo II*, 136

6    S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518).

7    B.    <u>Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim</u>

8        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

9    statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

10   complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R.

11   Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's

12   decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550

13   U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the

14   claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th

15   Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the

16   pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &*

17   *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not

18   simply recite the elements of a cause of action [and] must contain sufficient allegations of

19   underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

20   *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

21   990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

22   content that allows the court to draw the reasonable inference that the Defendant is liable for the

23   misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

24   'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

25   unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

26       Additionally, claims sounding in fraud or mistake are subject to the heightened

27   requirements of Federal Rule of Civil Procedure 9(b), which requires that a plaintiff "state with

28   particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The "circumstances"

United States District Court
Northern District of California

12

required by Rule 9(b) are the "who, what, when, where, and how" of the activity. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). In addition, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Id.* The purpose of Rule 9(b) is to require that a plaintiff's allegations be "specific enough to give defendants notice of the particular misconduct which is alleged . . .so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Rule 9(b) allows, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III.    <u>DISCUSSION</u>

Because a court "must dismiss the action" if it "determines at any time that it lacks subject-matter jurisdiction," Fed. R. Civ. P. 12(h)(3), this order first addresses Champion's arguments under Rule 12(b)(1) before turning to its request for relief under Rule 12(b)(6).[3] *See Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 815 (9th Cir. 2017) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)).

A.    <u>Rule 12(b)(1) Motion to Dismiss for Lack of Standing Over Ms. Sultanis's Claims on Behalf of the Multi-State and Nationwide Classes (Counts 1 and 6)</u>

The only non-California claims in Ms. Sultanis's complaints are for violations of the state consumer fraud acts of the thirteen states in the Multi-State Class (Count 1 in both actions) and for unjust enrichment on behalf of the Nationwide Class (Count 6 in the Poultry Action).[4] Poultry Compl. ¶¶ 76–82, 126–131; Fish Compl. ¶¶ 68–74. Champion argues that Ms. Sultanis lacks standing to pursue these non-California claims because she only purchased cat food in California. Poultry Mot. at 3–5, Fish Mot. at 4–6.

---

[3] Champion also moves to strike the claims of the Multi-State and Nationwide Classes (Counts 1 and 6) "due to material variations in each states' consumer protection laws." Poultry Mot. at 7; Fish Mot. at 7. The Court does not address those strike motions because, as discussed below, Ms. Sultanis does not have standing to sue on behalf of unnamed plaintiffs outside of California.

[4] The other claims (Counts 2 through 5) are only brought on behalf of Ms. Sultanis and the California Sub-Class. *See* Poultry Coml. ¶¶ 83–125; Fish Compl. ¶¶ 75–117.

United States District Court
Northern District of California

United States District Court
Northern District of California

This Court's position on this question has evolved in recent years.  In *In re Carrier IQ, Inc., Consumer Privacy Litigation*, individuals from 13 different states filed claims under forty-eight states' privacy and consumer protection statutes. 78 F.Supp.3d 1051, 1059 (N.D. Cal. 2015). Like here, the defendants argued that the named plaintiffs lacked standing to assert claims under the laws of states in which they did not reside.  At the time, "the Ninth Circuit recognized this question was an open one, expressly declining to reach the 'difficult chicken-and-egg question of whether class certification should be decided before standing.'"  *Id.* at 1069 (quoting *Perez v. Nidek Co.*, 711 F.3d 1109 (9th Cir. 2013)).  Although this Court concluded "it ha[d] the discretion to defer questions of standing until after class certification," it declined to exercise that discretion "as a matter of case management" because the "number of consumers from [thirty-five] other states in which state law claims are asserted is vast relative to the claims to which the named Plaintiffs have standing." *Id.*  The Court was concerned with "subjecting the [defendants] to the expense and burden of nationwide discovery without Plaintiffs first securing actual plaintiffs who clearly have standing and are willing and able to assert claims under these state laws." *Id.*  The Court was also concerned, "given the breadth of the proposed class and the number of state law claims asserted on behalf of the class," that "the requirements of class certification under Rule 23 may not be met or, if they [were], subclasses may have to be created which would engender delay (adding that any new named plaintiffs would likely be subject to another round of discovery and further class certification motion practice)." *Id.* at 1074–75.  As a result, the Court concluded that "[i]t makes sense to address standing to bring some 35 state law claims before class certification," and "the named Plaintiffs do not have standing to assert claims from states in which they do not reside or did not purchase their mobile device." *Id.* at 1075.

A couple of months after this Court decided *In re Carrier IQ*, however, the Ninth Circuit decided *Melendres v. Arpaio*, which involved an appeal of the district court's injunction prohibiting Sheriff Joseph Arpaio and his supervisees from using race as a factor in deciding whether to stop any vehicle with a Latino occupant. *See* 784 F.3d 1254, 1258 (9th Cir. 2015).  The injunction applied to stops during both "saturation patrol"—when the defendant officers would saturate a particular area for the purpose of enforcing immigration laws—and

nonsaturation patrols.  *See id.* at 1258–59.  Defendants argued that the plaintiffs lacked standing to bring constitutional claims on behalf of class members stopped during nonsaturation patrols, because the named plaintiffs had been stopped only during saturation patrols.  *See id.* at 1259.  In rejecting this argument, the Ninth Circuit broadly held that "*any* issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing."  *Id.* at 1262 (emphasis added) (quoting Newberg on Class Actions § 2:6).

After *Melendres*, Courts in the Ninth Circuit have been split on whether a named plaintiff in a putative class action has standing to assert claims under the laws of states where the named plaintiff does not reside or was injured.  On the one hand, most courts have held that plaintiffs can only bring claims on behalf of other consumers in states where they "were injured or had any pertinent connection."  *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019) ("The named Plaintiffs do not allege they were injured or had any pertinent connection to the twenty other states invoked by the Complaint.  The named Plaintiffs therefore lack standing to bring causes of action based on the laws of [those] states."); *Van Mourik v. Big Heart Pet Brands, Inc.*, No. 3:17-CV-03889-JD, 2018 WL 1116715, at *1 (N.D. Cal. Mar. 1, 2018) (plaintiff had no standing to bring California class claims because she "[was] a resident of Texas who saw the challenged advertisements in Texas and bought the defendant's dog food there" and "ha[d] no personal connection whatsoever to California"); *Corcoran v. CVS Health Corp., Inc.*, No. 15-CV-3504 YGR, 2016 WL 4080124, at *2 (N.D. Cal. July 29, 2016) ("Here, no plaintiff resides in, or alleges to have suffered an injury in, any of the thirty-eight states at issue in defendant's motion.  In such instances, the consensus among courts in this District, including the undersigned, is that named plaintiffs 'lack standing to assert claims based on those states' laws.'" (quoting *Fenerjian v. Nongshim Co. Ltd.*, 72 F. Supp. 3d 1058, 1082–83 (N.D. Cal. 2014))).

A growing minority of courts in this circuit have held, conversely, that whether a named plaintiff can represent class members whose claims arise under the laws of different states is not a standing question that needs to be decided at the motion to dismiss stage.  For example, Judge Chhabria persuasively reasoned that "whether a named plaintiff can represent class members

15

1   whose claims arise under the laws of different states does not appear to be a question of standing

2   [because] Patterson does not himself seek to raise a claim under the laws of a different state;

3   rather, he seeks to represent a class member who can raise such a claim." *Patterson v. RW Direct,*

4   *Inc.*, No. 18-CV-00055-VC, 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018); *see also Alvarez*

5   *v. NBTY, Inc.*, No. 17-CV-00567-BAS-BGS, 2017 WL 6059159, at *8 (S.D. Cal. Dec. 6, 2017)

6   ("Thus, this secondary standing analysis relating to Plaintiff Alvarez's standing as it relates to

7   multi-state class is best left for class certification and after further discovery."); *In re Hydroxycut*

8   *Mktg. and Sales Practices Litig.*, 801 F. Supp. 2d 993, 1005 (S.D. Cal. 2011) ("The constitutional

9   issue of standing should not be conflated with Rule 23 class action requirements.").

10          In *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products*

11  *Liability Litigation* ("*FCA*"), this Court joined the minority of its sister courts concluding that the

12  issue of whether unnamed plaintiffs have standing should not be conflated with the issue of

13  whether the named plaintiff is adequate, typical, or whether common questions predominate under

14  Rule 23.  295 F. Supp. 3d 927, 955 (N.D. Cal. 2018).  In that case, the named plaintiffs—like in *In*

15  *re Carrier IQ* and here—sought  to bring claims "under the laws of states where they do not reside

16  and where they did not transact with defendants, but where other class members do or did."  *Id.*

17  This Court concluded that, although the "disjuncture" in *Melendres* was different from the

18  disjuncture at issue in *FCA*, "*Melendres requires* courts in the Ninth Circuit to apply the 'class

19  certification approach,'" whereby "once the named plaintiffs demonstrate their individual standing

20  to sue . . . the standing inquiry may be concluded; the disjuncture may better be addressed in the

21  context of class certification."  *Id.* at 955–56 (emphasis added) (quoting *Melendres*, 784 F.3d at

22  1261).  Admittedly, the Court also chose to wait to decide the standing issue during class

23  certification in *FCA* because it did not have the same case management concerns that it did in *In re*

24  *Carrier*.  First, "the ratio of states with named Plaintiffs to states without [was] almost the

25  opposite," such that the defendants in *FCA* "would need to engage in near-nationwide discovery

26  even if the Court dismissed the state-law claims for states that do not have a named Plaintiff."  *Id.*

27  at 956.  Second, and relatedly, deferring the standing issue in *FCA* until the class certification

28  stage would not lead to unnecessary delays "because the number of states without a named

United States District Court
Northern District of California

16

Plaintiff [was] substantially smaller than in *In re Carrier IQ*."  *Id.*  The Court therefore concluded in *FCA* that "even if *Melendres* does not sweep so broadly as to impose a per se rule," it made sense to wait until class certification to decide whether the named plaintiffs could assert out-of-state claims on behalf of putative class members.  *Id.*

More recently, in *Phan v. Sargento Foods*, this Court took the opposite approach, deciding that it made more sense to decide whether the named plaintiff could bring claims on behalf of unnamed plaintiffs who purchased the products in other states at the pleadings stage.  No. 20-CV-09251-EMC, 2021 WL 2224260, at *12–*13  (N.D. Cal. June 2, 2021).  Importantly, however, the Court did not squarely frame its decision on this question as one involving Article III standing; rather, it concluded that "whether it be cast as a standing question *or an early adjudication of prospective class certification*, the Court exercises its discretion to hold that Plaintiff, on this record, cannot represent unnamed class members in states outside of California."  *Id.* (emphasis added).  In fact, the Court noted thoughtful opinions from other courts holding that whether a named plaintiff can raise claims from putative class members in states where the plaintiff did not reside or purchase the products at issue was a question of class certification, not standing.  For example, the Court cited *In re McCormick & Co*, in which Judge Huvelle of the District of Columbia District thoughtfully explained:

> It is more logical to consider named plaintiffs' ability to raise other state-law claims as a question of commonality, typicality, and adequacy under Rule 23, rather than a question of standing. Generally, the named plaintiffs in a class action do not have individual standing for all of the claims that they raise, because one individual does not have standing to claim injury to another individual.  Therefore, standing analysis cannot address whether one plaintiff should be able to bring claims on behalf of others.  In contrast, "the requirements of Rule 23(a) – commonality, typicality, and adequacy – exist to test the relationship between the named plaintiff's claims and those of the class."  Thus, when defendants are "not challenging Plaintiffs' standing to bring their own claims" but rather "their standing to bring claims on behalf of the class," "[t]his question would be appropriately, and more efficiently addressed at the class certification stage."
>
> Whether the named plaintiffs can adequately represent unnamed class members with claims under other states' laws depends on how variable the laws are.  If the laws are similar enough, or if they can be grouped into a small number of categories with named plaintiffs representing each category, it may be unnecessary to have a named

United States District Court
Northern District of California

17

plaintiff from every state.

217 F. Supp. 3d 124, 144 (D.D.C. 2016) (quoting William B. Rubenstein, *Newberg on Class Actions* § 2:6 (5th Ed. 2016)); *Cf. Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("Variations in state law do not necessarily preclude a 23(b)(3) action, but class counsel should be prepared to demonstrate the commonality of substantive law applicable to all class members."); *In re US FoodServ. Pricing Litig.*, 729 F.3d 108, 126-27 (2d Cir. 2013) ("[A]gree[ing] that putative class actions involving the laws of multiple states are often not properly certified pursuant to Rule 23(b)(3) because variation in the legal issues to be addressed overwhelms the issues common to the class [but] these concerns are lessened where the states' laws do not vary materially.").  After giving this question more thought, the Court today cements its conclusion—in line with Judges Chhabria and Huvelle, among others—that whether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing.

Just because this question does not involve Article III standing does not mean that the Court does not have discretion to conclude at the pleadings stage that Ms. Sultanis does not satisfy the adequacy, typicality, or predominance requirements to bring claims on behalf of unnamed plaintiffs in multiple other states where she does not reside or where she did not purchase the Products.  *See Phan*, 2021 WL 2224260, at *13 ("[T]he Court exercises *its discretion* to hold that Plaintiff, on this record, cannot represent unnamed class members in states outside of California." (emphasis added)); *Patterson*, 2018 WL 6106379, at *1 ("[T]his issue will be addressed in connection with class certification, [but] it is questionable whether Patterson will be able to pursue a nationwide class action, and given the California-centric nature of this case it may be appropriate to address adequacy and commonality before allowing Patterson to embark on nationwide class discovery.").  Here, as Sargento did in *Phan*, Champion identifies "substantial variations in the consumer protection laws of the [13] states at issue," including whether notice, intent, reliance, or causation are required, as well as whether a three-, four-, five-, or six-year statute of limitations applies.  *Id.*  For instance:

- <u>Notice</u>.  California's, Massachusetts', and Missouri's consumer protection statutes appear to require some form of notice before suit can be initiated.  *See* Cal. Civ. Code § 1782(a); Mass. Gen. Laws Ch. 93A, § 9(3); Mo. Rev. Stat. § 407.025.7. Ms. Sultanis admits in her complaint that she did not give Champion notice of her claims.  *See* Compl. ¶ 105.

- <u>Intent</u>.  Illinois's, Michigan's, and Minnesota's consumer protection statutes appear to require some form of intent to deceive on the part of the defendant.  *See Griffin v. Univ. Cas. Co.*, 654 N.E.2d 694, 700–01 (Ill. Ct. App. 1995); *In re OnStar Contract Litig.*, 278 F.R.D. 352, 376 (E.D. Mich. 2011); Minn. Stat. §§ 325F.67, 325F.69(1).

- <u>Reliance</u>.  Michigan's consumer protection statute appears to require an individualized showing of reliance.  *See In re OnStar Contract Litig.*, 278 F.R.D. at 376

- <u>Causation</u>.  Illinois's consumer protection statute appears to require an individualized showing of causation.  *See, e.g.*, *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002)

- <u>Statute of Limitations</u>.  California's, Illinois's, and Washington's statute of limitations for consumer protection claims appears to be three years, Cal. Civ. Code § 1783; 815 Ill. Comp. Stat. 505/10a(e); *Shepard v. Holmes*, 345 P.3d 786, 789 (Wash. Ct. App. 2014), Florida's and Massachusetts's appears to be four years, Fla. Stat. Ann. § 95.11(3)(f); Mass. Gen. Laws ch. 260, § 5A., Missouri's appears to be five years, Mo. Ann. Stat. § 516.120, and Michigan's, Minnesota's, and New Jersey's appear to be six years, Mich. Comp. Laws Ann. § 445.911(7); Minn. Stat. § 541.05(1)–(2); N.J. Stat. Ann. § 2A:14-1.  To complicate matters further, Florida, Minnesota, and New York do not appear to recognize or limit the application of the discovery rule.  *See, e.g.*, *Veldhuizen v A.O. Smith Corp.*, 839 F. Supp. 669, 674 (D. Minn. 1993).

Rather than contend with these differences, Ms. Sultanis simply responds that Champion's

19

1    "premature request to strike class allegations at the pleading stage, before any discovery has been

2    taken, is unwarranted."  Poultry Action, Docket No. 32 ("Poultry Opp'n") at 6.  But no amount of

3    discovery will change the fact that the consumer protection laws of the thirteen states at issue here

4    are so substantively different that it would be exceedingly difficult to certify a class that satisfies

5    the adequacy, typicality, or predominance requirements particularly with only Ms. Sultanis at the

6    helm.

7         Indeed, the Court here has the same case management concerns it had in *In re Carrier* and

8    *Phan*.  In fact, the ratio of named plaintiff to out-of-state putative class member is worse here (one

9    to twelve) than in *In re Carrier* (one to 2.6) and *Phan* (one to nine), raising "a meaningful risk that

10   the requirements of class certification under Rule 23 may not be met or, if they are, subclasses

11   may have to be created which would engender delay (adding that any new named plaintiffs would

12   likely be subject to another round of discovery and further class certification motion practice)."  78

13   F. Supp. 3d at 1074–75.  Moreover, allowing the case to proceed currently will subject Champion

14   to nation-wide discovery because Ms. Sultanis asserts unjust enrichment claims on behalf of

15   plaintiffs who purchased the Products nationwide.  These concerns make it so that it is more

16   appropriate to decide the typicality, adequacy, and predominance issues now, prior to formal class

17   certification proceedings.

18        The Court therefore concludes that, in the instant case, the substantial variations in the

19   consumer protection laws in the thirteen states at issue "underscore[] the problematic nature of the

20   request that [Ms. Sultanis] singularly be appointed to be the named representative of" the

21   Nationwide and Multi-State Classes.  *Phan*, 2021 WL 2224260, at *13.  Therefore, "the Court

22   exercises its discretion to hold that [Ms. Sultanis], on this record, cannot represent unnamed class

23   members in states outside of California."  *Id.*  To be clear, the Court reaches this conclusion under

24   Rule 23, not Article III.

25        Accordingly, the Court **GRANTS** Champion's motion to dismiss Ms. Sultanis's claims on

26   behalf of the Multi-State Class under Count 1 in both actions and on behalf of the Nationwide

27   Class under Count 6 in the Poultry Action.

28

United States District Court
Northern District of California

B.      Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim Under the CLRA, FAL, and

UCL Fraud Prong

The FAL and CLRA prohibit false or misleading advertising.  Specifically, the FAL

prohibits the dissemination of any statement concerning property or services "which is untrue or

misleading, and which is known, or which by the exercise of reasonable care should be known, to

be untrue or misleading."  Cal. Bus. & Prof. Code § 17500.  The CLRA prohibits certain "unfair

methods of competition and unfair or deceptive acts or practices undertaken by any person in a

transaction intended to result or which results in the sale or lease of goods or services to any

consumer."  Cal. Civ. Code § 1770(a).  One practice proscribed by the CLRA is "[r]epresenting

that goods or services are of a particular standard, quality, or grade . . . if they are of another."  *Id.*

§ 1770(a)(7).  Similarly, the UCL creates a cause of action for business practices that are unlawful,

unfair, or fraudulent.  Cal. Bus. & Prof. Code § 17200.  Each "prong" of the UCL provides a

separate and distinct theory of liability.  *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731

(9th Cir. 2007).  Ms. Sultanis asserts causes of action under all three prongs of the UCL.

A violation of the FAL or the CLRA is also a violation of the fraud prong of the UCL.  *See*

*In re Tobacco II Cases*, 207 P.3d 20, 29 n.8 (Cal. 2009) ("A violation of the UCL's fraud prong is

also a violation of the false advertising law."); *Consumer Advocs. v. Echostar Satellite Corp.*, 8

Cal. Rptr. 3d 22, 29 (Cal. Ct. App. 2003) ("*Lavie* considered only the application of the reasonable

consumer standard to the UCL and False Advertising Act, we do not hesitate to find that it also

applies to the CLRA.").  "Because the same standard for fraudulent activity governs all three

statutes, courts often analyze the three statutes together."  *Hadley v. Kellogg Sales Co.*, 273 F.

Supp. 3d 1052, 1063 (N.D. Cal. 2017); *see also In re Sony Gaming Networks & Customer Data*

*Sec. Breach Litig.*, 996 F. Supp. 2d 942, 985 (S.D. Cal. 2014) ("Courts often analyze these statutes

together because they share similar attributes.").  Ms. Sultanis does not dispute that her causes of

action under the FAL, the CLRA, and the fraud prong of the UCL rise or fall together.

1.      False or Misleading

Under the FAL, CLRA, and the fraud prong of the UCL, conduct is considered deceptive

or misleading if the conduct is "likely to deceive" a "reasonable consumer."  *Williams v. Gerber*

*Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  The "reasonable consumer" is not necessarily a "particularly sophisticated consumer."  *Brod v. Sioux Honey Ass'n, Co-op*, 927 F. Supp. 2d 811, 828 (N.D. Cal. 2013).  "To the contrary, questions of judgment calling for the perspective of a reasonable consumer are 'determined in the light of the effect [such a question] would most probably produce on ordinary minds.'"  *Id.* (quoting *Donaldson v. Read Magazine*, 333 U.S. 178, 189 (1948)).  "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner."  *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (Ct. App. 2003).  "Rather, the phrase indicates that the ad is such that it is *probable* that a *significant portion* of the general consuming public or of targeted consumers, acting *reasonably* in the circumstances, *could be misled*."  *Id.* (emphases added).

Courts have repeatedly emphasized that the reasonable consumer analysis is "usually . . . a question of fact not appropriate for decision on" a motion to dismiss.  *Williams*, 552 F.3d at 938. Therefore, "[g]ranting a motion to dismiss is appropriate only in 'the rare situation' where 'the advertisement itself [makes] it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived,'"  *Coe v. Gen. Mills, Inc.*, No. 15-CV-05112-TEH, 2016 WL 4208287, at *5 (N.D. Cal. Aug. 10, 2016) (quoting *Williams*, 552 F.3d at 939), or, similarly, where "no reasonable consumer" would be misled by the advertisement, *Williams*, 552 F.3d at 939.

          a.   <u>Poultry Action</u>

In the Poultry Action, Ms. Sultanis plausibly alleges claims under the FAL, CLRA, and the fraud prong of the UCL because the statement "made with free-run chicken" is not false or misleading.  The term "free-run," on its own, could reasonably be read to imply that the chickens used to make the Products can freely run outside, especially because the Products' label also depicts chicken running freely on a spacious, grassy, and outdoor field without any disclaimer that those are not the chickens used to make the Products.  *See Williams*, 552 F.3d at 936 (district court erred in dismissing plaintiffs' complaint alleging that "the use of the words 'Fruit Juice' juxtaposed alongside images of fruits such as oranges, peaches, strawberries, and cherries" was false and misleading); *Maisel v. S.C. Johnson & Son, Inc.*, No. 21-CV-00413-TSH, 2021 WL

United States District Court
Northern District of California

1788397, at *9 (N.D. Cal. May 5, 2021) (denying motion to dismiss complaint alleging that products were made with "plant-based ingredients" in part because they "also display[ed] images of plants, including flowers and leaves, and use green coloring"); *Tucker v. Post Consumer Brands, LLC*, No. 19-CV-03993-YGR, 2020 WL 1929368, at *5 (N.D. Cal. Apr. 21, 2020) ("Although the package does not make any objective representations about the amount of honey in the cereal, a reasonable consumer could see the prominent honey-related words *and imagery* and be deceived into thinking the cereal contained relatively less refined sugar and more honey." (emphasis added)).  Put differently, "[a] significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled" by the term "made with free-run chicken," coupled with this imagery of chickens running outside, into thinking that the chickens used to make the Products can indeed freely run outside.  *Lavie*, 105 Cal. App. 4th at 508.

Champion does not dispute that the chickens used to make the Products cannot run outside, only inside their barns.  Nonetheless, Champion contends the statement "free-run chicken" is true because "Canadian trade organizations" define it as chickens that are "free to run throughout the barn in which they were raised."  Poultry Mot. at 11.  The first problem with this argument, however, is that Champion does not ask for judicial notice of this supposed "official" Canadian definition of the term "free-run chicken."  Unless there is a proper way to take judicial notice of this definition, the Court cannot consider it because "review is limited to the complaint" under Rule 12(b)(6).  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993)); *see also United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) ("As a general rule, we 'may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" (quoting *Lee*, 250 F.3d at 688)).  "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)."  *Id.*  The Court therefore cannot take at face value how Champion contends Canadian authorities define the term "free-run chicken."

In any case, that Canadian authorities define "free-run chicken" as chickens that can run inside a barn is not dispositive of Ms. Sultanis's false advertising claims.  For one, it is highly

implausible that Ms. Sultanis was aware of this Canadian definition given that she lives in the United States.  The Court cannot determine on the pleadings whether Ms. Sultanis knew what "free-run chicken" means in Canada.  In any event, what the Canadian government does via regulation is not dispositive of what and how U.S. consumers are likely to react to given ads. "The California Supreme Court has recognized 'that [the CLRA, FAL, and UCL] prohibit not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public.'" *Williams*, 552 F.3d at 938 (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)).  In other words, "[t]he relevant question is not what [the term "free-run chicken"] mean[s], but rather what [it] mean[s] to reasonable consumers, which cannot be resolved on a motion to dismiss."  *Rice-Sherman v. Big Heart Pet Brands, Inc.*, No. 19-CV-03613-WHO, 2020 WL 1245130, at *8 (N.D. Cal. Mar. 16, 2020); *see also Vicuna v. Alexia Foods, Inc.*, No. C 11-6119 PJH, 2012 WL 1497507, at *2 (N.D. Cal. Apr. 27, 2012) ("Because the question whether a reasonable consumer would likely be deceived by the designation 'All Natural' is a factual dispute, the court finds that these claims cannot be resolved at this stage of the litigation.").  How Canadian authorities define the term "free-run chicken" is therefore irrelevant to establish, as a matter of law, whether that term is false or misleading to American consumers like Ms. Sultanis.  *See  In-N-Out Burgers v. Smashburger IP Holder LLC*, No. SACV171474JVSDFMX, 2018 WL 7891028, at *5 (C.D. Cal. Dec. 21, 2018) ("Even if it is literally true that In-N-Out's meat is free from 'additives, fillers, or preservatives,' such a claim could be misleading to consumers who treat is [sic] as a claim that the meat is free from any added substances (such as antibiotics) or byproducts of those substances."); *Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 898 (N.D. Cal. 2012) ("Notwithstanding Defendant's discussion at the motion hearing of preservatives and firming agents, the Court concludes that this case is far less about science than it is about whether a label is misleading.").  This is especially true given that, as Champion concedes, the nearly identical terms "free-range chicken" and "free-roaming chicken" are ubiquitously used in the United States to refer to chickens that can run outside.  *See* Poultry Mot. at 11 ("If the bags of pet food at issue in this case stated that they included only 'free range' chicken, that representation would be false.").

United States District Court
Northern District of California

24

1    Ms. Sultanis has therefore plausibly alleged with sufficient particularity under Rule 9(b)

2    that the statement "made with free-run chicken" is false or misleading.

3                    b.    <u>Fish Action</u>

4    Champion first argues that the statement "brimming with wild-caught fish" is not false or

5    misleading because the fish Products contain wild-caught catfish and white perch, even though

6    they *also* contain farmed rainbow trout.  Fish Mot. at 11.  In fact, Champion points out that the

7    photos of fishermen in fresh-water lakes, one of whom is holding a wild-caught catfish, are photos

8    of the Kentucky fishermen who supply Champion with wild-caught catfish and white perch used

9
    That's why we loaded ACANA FRESHWATER FISH FORMULA with rainbow trout from Idaho plus wild-caught blue
10   catfish and white perch from Grand River, Kentucky — delivered fresh and whole in richly nourishing WholePrey™
     ratios that promote peak health naturally, without long lists of synthetic additives, grains or GMO ingredients.

11   in the Fish Products.  Fish Mot. at 12 (citing Compl. ¶ 20).  Indeed, none of the Products'

12   packaging or website advertising cited in the fish complaint state that "all" or "100%" of the fish

13   used in the Products was wild caught.  Champion also attaches to its motion screenshots[5] of other

14   parts of the fish Products' packaging disclaiming that the fish Products contain rainbow trout from

15   Idaho *and* wild-caught catfish and white perch from Kentucky:



23   Fish Mot. at 13.  Considering these disclaimers, Champion urges the Court to dispense of Ms.

24

25   _____

26   [5] The Court takes judicial notice of these screenshots because they are part of the Products'
     packaging, and as such are (1) referenced in the complaint, (2) central to Ms. Sultanis's claim, and
27   (3) she does not question their authenticity.  *See Corinthian Colleges*, 655 F.3d at 999 ("[Courts]
     may . . . consider unattached evidence on which the complaint 'necessarily relies' if (1) the
28   complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no
     party questions the authenticity of the document." (quoting *Marder v. Lopez*, 450 F.3d 445, 448
     (9th Cir. 2006))).

1  Sultanis's CLRA, FAL, and UCL claims to the extent they are based on the statement "brimming

2  with wild-caught *fish*," because that statement is not false or misleading.

3        There are several problems with this argument.  First, the Ninth Circuit has instructed

4  lower courts that "reasonable consumers should [not] be expected to look beyond misleading

5  representations on the front of the box to discover the truth from the ingredient list in small print

6  on the side of the box."  *Williams*, 552 F.3d at 939; *see also Anthony v. Pharmavite*, No. 18-CV-

7  02636-EMC, 2019 WL 109446, at *4 (N.D. Cal. Jan. 4, 2019) ("[T]here is a question of fact

8  whether a reasonable consumer would notice it and follow it to the disclaimer."); *McMorrow v.*

9  *Mondelez Int'l, Inc.*, No. 17-CV-02327-BAS-JLB, 2018 WL 3956022, at *12 (S.D. Cal. Aug. 17,

10  2018) ("[W]hile keeping in mind that the Court considers the advertising statements in context of

11  the overall advertisement, it also does not find that the Products' mandated content disclosures

12  cure any ambiguities of the health and nutrition claims that Plaintiffs are challenging.").  Here,

13  whether a reasonable consumer read the inconspicuous disclaimers that explain the ingredients

14  include wild-caught *and* farmed fish is, at the very least, a question of fact.

15        Second, even assuming a reasonable consumer read the disclaimers identified by

16  Champion, "it cannot be concluded as a matter of law that the substance of the disclaimer would

17  be sufficient to disabuse the consumer of any misconceptions engendered by the ['brimming with

18  wild-caught fish'] representation[]."  *Anthony*, 2019 WL 109446, at *4.  For instance, the

19  identified disclaimers only explain that the Products are "loaded . . . with rainbow trout from Idaho

20  and wild-caught blue catfish and white perch from Grand Rapids, Kentucky;" they do not identify

21  what percentage of the fish used in the Products is wild caught, nor do they explicitly say that the

22  rainbow trout from Idaho is farmed.  It is therefore entirely possible that a reasonable consumer

23  read the disclaimers and still thought the rainbow trout was wild caught.  *See id.* ("[I]n view of the

24  promises of the health benefit representation on the labels, '[t]he Court cannot find that

25  Defendant's [disclaimer] is so unambiguous and express such that a reasonable consumer is

26  unlikely to be deceived as a matter of law' by the health benefit representations on the Biotin

27  Products." (quoting *Sperling v. Stein Mart, Inc.*, No. CV 15-01411 BRO (KKx), 2016 WL

28  11265686, at *5 (C.D. Cal. Mar. 15, 2016))).  This presents a question of fact.

United States District Court
Northern District of California

United States District Court
Northern District of California

Third, the fact that the Products contain some wild-caught fish does not mean that the statement "brimming with wild-caught fish" is not misleading.  The statements do not need to use qualifiers like "all" or "100%" in its representations in order to be misleading.  For example, in *Janney v. Mills*, the court explained that the absence of "100%," or "All," from the term "Natural" is not significant in determining the deceptiveness of the "Natural" representation on the packaging of a granola bar that included, although not exclusively, synthetic ingredients.  944 F. Supp. 2d 806, 817 (N.D. Cal. 2013); *see also Jou v. Kimberly-Clark Corp.*, No. C-13-03075 JSC, 2013 WL 6491158, at *6 (N.D. Cal. Dec. 10, 2013) ("While the use of 'all' in 'all natural' may make the inference *even more* plausible than the inference arising from the use of just 'natural,' the use of 'natural' still provides the plausible inference required to defeat a Rule 12(b)(6) motion.").  Likewise here, although it is certainly *more* plausible that Ms. Sultanis would have been misled by the statements "all wild-caught fish" or "100% wild-caught fish," that does not mean it is entirely implausible that she was misled into thinking that the Products were free from farmed fish by the term "brimming with wild-caught fish."

Recently cases involving cleaning products that illustrate the idea that statements broadly describing a certain type of ingredient can mislead consumers into thinking the products at issue contain *only* that type of ingredient.  For example, in *Maisel v. S.C. Johnson & Son, Inc.*, the court concluded that a plaintiff plausibly alleged she was misled by the term "plant-based ingredients" into thinking the cleaning products at issue contained *only* plant-based ingredients, even though "[t]here is no dispute that the products contain[ed] at least *some* plant and/or mineral ingredients." No. 21-CV-00413-TSH, 2021 WL 1788397, at *9 (N.D. Cal. May 5, 2021); *see also Balser*, 640 F. App'x 694, 696 (9th Cir. 2016) ("[T]he statements that the products were 'natural' . . . could be taken as a claim that no synthetic chemicals were in the products, a claim the complaint alleges, in detail, is false."); *Przybylak v. Bissell Better Life LLC*, No. CV 19-2038 PA (GJSX), 2019 WL 8060076, at *6 (C.D. Cal. July 19, 2019) ("Plaintiffs plausibly allege that Defendant falsely or misleadingly represented that its products were "natural" or "plant-derived," . . . and that a reasonable consumer would understand those representations to mean that the products did not contain unnatural or synthetic ingredients."); *Kutza v. Williams-Sonoma, Inc.*, No. 18-cv-03534-

RS, 2018 WL 5886611, at *4 (N.D. Cal. Nov. 9, 2018) (rejecting William-Sonoma's argument that "the label phrase 'Active Ingredients Derived from Natural Sources' is literally true, and [therefore] no reasonable consumer would expect the products necessarily to be completely free from 'unnatural and/or synthetic ingredients'"); *Gregorio v. Clorox Co.*, No. 17-CV-03824-PJH, 2018 WL 732673, at *4 (N.D. Cal. Feb. 6, 2018) ("While defendant appears to concede that '100% natural' and 'all natural' would be misleading, defendant fails to recognize that the court is not free to dismiss claims because defendant chose not to use a potentially more misleading phrase.  And 'the phrase ["naturally derived"] may be tantamount to, or at least could reasonably be understood to mean "all natural" or "100% natural."'" (quoting *Pecanha v. The Hain Celestial Grp., Inc.*, 2018 WL 534299, at *3 (N.D. Cal. Jan. 24, 2018))); *Shank v. Presidio Brands, Inc.*, No. 17-CV-00232-DMR, 2018 WL 510169, at *9 (N.D. Cal. Jan. 23, 2018) ("The statement 'naturally-derived,'] on the labels of Every Man Jack products 'could easily be interpreted by consumers as a claim that all the ingredients in the product[s] were natural,' which Shank has plausibly alleged is false." (quoting *Williams*, 552 F.3d at 939)).  As in these cases, although Champion does not make any objective representations about the amount of wild-caught fish in the Products, it is plausible that a reasonable consumer could be deceived by the statement "brimming with wild-caught fish" into thinking the products only—or mostly—contain fish that was caught in the wild.

Finally, Champion acknowledges in its motion that at least one of the statements identified by Ms. Sultanis in the fish complaint, "admittedly (and inadvertently) misstated that it contained wild-caught *rainbow trout*."  Fish Mot. at 2.  The fish complaint indeed attaches screenshots of not one, but several websites, including Champion's website, describing the products as "brimming with wild-caught rainbow trout" or "with wild-caught rainbow trout."  *See* Fish Compl. ¶¶ 15–19.  After reading these statements, there is no disclaimer, and certainly not one simply stating that the products are made "with rainbow trout," that would disabuse a reasonable consumer from assuming the products contain *wild-caught* rainbow trout.  Because it is undisputed that Products did not contain "wild-caught *rainbow trout*," the Court cannot conclude that statement is not false or misleading, let alone true.

United States District Court
Northern District of California

Ms. Sultanis has therefore plausibly alleged with sufficient particularity under Rule 9(b) that the statements "brimming with wild-caught fish" and "brimming with wild-caught rainbow trout" are either false or misleading.

### 2.   Reasonable Reliance

#### a.   Poultry Action

Champion argues that Ms. Sultanis failed to plausibly allege that she relied on the "free-run chicken" statement and that a reasonable person would attach importance to the fact that the Products were made with chickens that can run outside.  To the contrary, the complaint in the Poultry Action plainly states that Ms. Sultanis purchased the ACANA Meadowland Regional Formula Grain Free Dry Cat & Kitten Food on July 24, 2017 on Chewy.com, after reviewing the "free-run chicken" statement "as stated on the packaging and in Champion's marketing and advertising materials described herein."  Poultry Compl. ¶ 57–60.  It also states that she purchased the Products believing these statements to be true, and that she would not have purchased the Products, or would have paid less for the Products, had she known that they were not made with chickens that were allowed to run outside.  *See id.* at 60–62.  Several cases, including those cited by Champion, establish that these types of allegations are sufficiently specific to plausibly allege reliance in the context of the FAL, CLRA, and the UCL's fraud prong.  *See e.g.*, *Rice-Sherman*, 2020 WL 1245130, at *8 ("Plaintiffs have alleged [reasonable reliance because t]hey state that they relied upon the 'Grain Free,' 'No Corn,' and 'No Soy Protein' representations on the product packaging in deciding to purchase the product and that they would not have purchased the food if the actual ingredient list was fully disclosed."); *Anthony*, 2019 WL 109446, at *5 (dismissing plaintiffs' UCL claim without prejudice because "[t]hey do not specify what part of the labels and representations they saw and relied upon."); *Figy v. Frito-Lay N. Am., Inc.*, 67 F. Supp. 3d 1075, 1088 (N.D. Cal. 2014) ("[R]rather than allege reliance on an alleged misrepresentation as required by the UCL, at best Plaintiffs misbranding theory only alleges reliance on the 'salability' of the products.").

Champion points out that the complaint alleges that other products, but *not* the cat food that Ms. Sultanis purchased, contained photographs of chicken running in an outdoor grass field.

*Compare* Poultry Compl. ¶ 16 ("'Wholesome Grains Free-Run Poultry Recipe' dog food"), *with id.* ¶ 59 ("ACANA Meadowland Regional Formula Grain-Free Dry Cat & Kitten Food").  But Ms. Sultanis explains that "although not alleged in the Complaint, the variety [she] purchased also prominently displays an image of a green pasture on the front of the label with the accompanying claim 'Free-Run Poultry.'"  Poultry Opp'n at 12 n.6.  Notably, Champion does not contend that some of its Poultry Products did not contain the "free-run chicken" statement.  Since there appears to be no material differences in the Products' packaging, Champion cannot argue that it does not have fair notice of Ms. Sultanis's claims simply because it does not know exactly what product she purchased.

Moreover, the Ninth Circuit has admonished lower courts for dismissing false advertising claims under California law "solely on [their] own review of an example of the packaging." *Williams*, 552 F.3d at 938.  Rather, determining "[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing evidence from both sides' [] which usually cannot be made on demurrer." *Id.* at 938–39 (quoting *Linear Tech. Corp. v. Applied Materials*, 61 Cal. Rptr. 3d 221 (Cal. App. 2007)).  It is entirely plausible that Ms. Sultanis reasonably relied solely on the use of the statement "made with free-run chicken," which Champion does not dispute was on the label of *all* the Products.  It is also plausible that the product Ms. Sultanis purchased also had depictions of chickens running in outdoor grass fields. Either way, further discovery is necessary to resolve this factual issue.  In the meantime, Ms. Sultanis's allegations are sufficient to plausibly state reasonable reliance with particularity for purposes of Rule 9(b).

Champion also argues that even if Ms. Sultanis plausibly alleged that *she* relied on the "made with free-run chicken" statement, that reliance was unreasonable because she has not plausibly pled that a reasonable person would attach importance to the fact that the Products were made with chickens that can run outside.  This argument has little force because Ms. Sultanis supports her allegation that "the use of the terms 'free-run poultry' are powerful statements that are important to consumers" by citing studies showing that, for example, "84% of food shoppers say it is 'important' or 'very important' to provide better living conditions for animals."  Poultry

Compl. ⁋⁋ 50–51.  She also cites studies allegedly showing that "89% of consumers" are very concerned about farm animal welfare; "74% stated that they were willing to pay more for humanely raised meat products."  *Id.* ⁋ 52.  Similarly, the complaint points to a 2018 survey from the National Chicken Council where three-quarters of respondents "said they were concerned about how chickens are raised for meat."  *Id.* at 53.  The list goes on, and includes studies showing that consumers' concerns with how farm animals—particularly chickens—are raised are "increasingly carrying over to pet foods."  *Id.* ⁋⁋ 54–56.  Ms. Sultanis also cites in her complaint statements from other consumers who were deceived by the "made with free-run chicken" statement.  *Id.* ¶¶ 27–28.  Taking all of these allegations as true, as the Court must at the motion to dismiss stage, requires concluding that Ms. Sultanis has plausibly pled that reasonable consumers care that the Products were made with chickens that can run outside.

The Court therefore concludes that Ms. Sultanis has plausibly pled reasonable reliance with sufficient particularity under Rule 9(b).

> b.  <u>Fish Action</u>

Like the poultry complaint, the fish complaint also alleges that Ms. Sultanis purchased the ACANA Meadowland Regional Formula Grain Free Dry Cat & Kitten Food on July 24, 2017 on Chewy.com, after reviewing the "wild-caught fish" and "wild-caught rainbow trout" statements "as stated on the packaging and in Champion's marketing and advertising materials described herein."  Fish Compl. ⁋ 39–41.  It also states that she purchased the Products believing these statements to be true, and that she would not have purchased the Products, or would have paid less for the Products, had she known that they were made with farmed fish.  *See Id.* at 41–42. Unlike the poultry complaint, however, these allegations are insufficient to plead reliance with sufficient particularity under Rule 9(b).

The first problem with these allegations is that Ms. Sultanis now admits that she did not in fact review, let alone rely upon, the statements on Champion's, Amazon's, or PetCo's websites stating that the products were "brimming with wild-caught ***rainbow trout***."  *See* Fish Action, Docket No. 27 ("Fish Opp'n") at 12.  Champion cornered Ms. Sultanis into admitting this by pointing out in its motion that these online statements were posted "*long after*" Ms. Sultanis

31

1   purchased the Products in July 2017, making it impossible for her to have relied on them.  *See*

2   Fish Opp'n at 16.

3           The allegations that Ms. Sultanis viewed and relied upon the statement "brimming with

4   wild-caught *fish*"—which Champion does not dispute was on the package of the Products Ms.

5   Sultanis purchased—would have been sufficient to establish reasonable reliance had Champion

6   not pointed out that the packaging also contains the disclaimers identified above.  *See supra* Part

7   III.B.1.b.  Those disclaimers to some extent explain that the Products are made with rainbow trout

8   and wild-caught blue catfish/white perch.  As this Court noted in *Anthony*, a plaintiff fails to plead

9   reliance with sufficient particularity under Rule 9(b) if their "complaint is devoid of any

10  allegations regarding whether Plaintiffs saw the asterisk, read the corresponding disclaimer, and if

11  they did read it, how the disclaimer affected their purchasing decision."  2019 WL 109446, at *5.

12  Here, as in *Anthony*, the complaint makes no mention of the disclaimers Champion identifies.  In

13  fact, Ms. Sultanis "do[es] not specify what part of the labels and representations [she] saw and

14  relied upon."  *Id.*; *see also Chase v. Hobby Lobby Stores, Inc.*, No. 17-CV-00881-GPC-BLM,

15  2017 WL 4358146, at *9 (S.D. Cal. Oct. 2, 2017) (dismissing false advertising claim for failure to

16  satisfy Rule 9(b) because plaintiff did not allege whether she saw the asterisk in the challenged

17  advertisement or if she read the corresponding disclaimer); *Sperling*, 2016 WL 8925347, at *8

18  (dismissing false advertising claim because complaint "fails to adequately plead, with any

19  particularity," any allegations regarding the asterisk on defendant's price tags that directs

20  consumers to defendant's pricing policy).  Unlike in the Poultry Action, where the package had no

21  competing language contextualizing the "made with free-run chicken" statement, the misleading

22  "brimming with wild-caught fish" statement in the Fish Action was potentially cured by the

23  disclaimers.  Ms. Sultanis does not allege, for instance, whether she read the disclaimers and did

24  not understand them to mean that only the trout was wild caught, or that she did not read them at

25  all because they were too small or inconspicuous.

26          The Court therefore **GRANTS** Champion's motion to dismiss Ms. Sultanis's Counts 3

27  (CLRA), 4 (FAL), and 5 (UCL) in the Fish Action with leave for her to add, with sufficient

28  particularity to satisfy Rule 9(b), what statements on the Products' packaging she actually saw,

relied upon, and understood.

C.      Rule 12(b)(6) Motion to Dismiss Breach of Express Warranty Claims

The Court **DENIES** Champion's motions to dismiss Ms. Sultanis's express warranty claims in both actions because they are predicated on the same unavailing arguments that the "free-run chicken" and "wild-caught fish/rainbow trout" statements are neither false nor misleading. *Rice-Sherman*, 2020 WL 1245130, at \*11; *Koehler v. Litehouse, Inc.*, No. CV 12-04055 SI, 2012 WL 6217635, at \*4 (N.D. Cal. Dec. 13, 2012).

D.      Rule 12(b)(6) Motion to Dismiss Unjust Enrichment Claim in Poultry Action

The Court **DENIES** Champion's motion to dismiss Ms. Sultanis's unjust enrichment claim (Count 6) in the Poultry Action because it is predicated on the same unavailing arguments that the "free-run chicken" statement is neither false nor misleading under the CLRA, FAL, or UCL. Poultry Mot. at 13.

## IV.      CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Champion's motions to dismiss as follows:

- Ms. Sultanis's claims on behalf of the Nationwide Class under Count 6 of the Poultry Action are **DISMISSED without leave to amend**.

- Ms. Sultanis's claims on behalf of the Multi-State Class under Count 1 of both Actions are **DISMISSED with leave to amend**. If Ms. Sultanis amends her complaint to add similarly situated named plaintiffs in some or all of the states currently comprising the Multi-State Class and survives a further motion to dismiss, class certification would not be decided until a formal motion is filed under Rule 23 – the Court would then examine, *inter alia,* issues of manageability.

- Ms. Sultanis's claims on behalf of herself and the California Sub-Class under Counts 3 (CLRA), 4 (FAL), and 5 (UCL) in the Fish Action **are DISMISSED** for failure to state a claim **with leave to amend.**

- The motions are **DENIED** as to all other counts.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Ms. Sultanis is instructed to file any amended complaint no later than thirty (30) days after the date of this order.

This order disposes of Docket No. 24 in the Poultry Action (C-21-0162 EMC) and Docket No. 21 in the Fish Action (C-21-0167 EMC).

**IT IS SO ORDERED**.

Dated: August 3, 2021

_____
EDWARD M. CHEN
United States District Judge